DAVID BOURQUIN, ADMINISTRATOR (ESTATE OF GAYLE BOURQUIN) *v.* B. BRAUN MELSUNGEN ET AL.
(13003)

Dupont, C. J., and Spear and Shea, Js.

Argued September 26, 1995—decision released February 13, 1996

*Steven J. DeFrank*, with whom, on the brief, was *Ira B. Grudberg*, for the appellant (plaintiff).

*Eugene A. Cooney*, with whom, on the brief, was *William J. Scully*, for the appellee (defendant St. Francis Hospital and Medical Center).

SHEA, J. The plaintiff, David Bourquin, as administrator of the estate of his wife, Gayle Bourquin, brought this action on June 2, 1988, to recover damages for her wrongful death on March 4, 1987, as a result of an operation performed on April 23, 1985, by the defendant Stephen Lange, a neurosurgeon, at the St. Francis Hospital and Medical Center (St. Francis Hospital). The plaintiff has appealed from a summary judgment ren-

dered by the trial court in favor of the defendant St. Francis Hospital[1] because of the inability of the plaintiff to produce an expert witness to testify at the prospective trial concerning the standard of care applicable to a hospital under the circumstances of the operation. The court had previously granted a motion to preclude such testimony after the plaintiff had failed to disclose such a witness within the deadline previously set by the court after the time limit established by Practice Book § 220 (D) had expired.

The plaintiff claims that the summary judgment for the hospital should be reversed because (1) he should have been allowed to disclose an expert witness qualified to testify with respect to hospital standards whom he found a short time after the motion to preclude had been granted, (2) the trial court should have permitted a proposed amendment to his complaint amplifying the specifications of negligence against the hospital by adding allegations concerning its failure to heed certain warnings on a box containing the material used by Lange in the operation on the decedent, and (3) the unamended complaint implicitly presented the same issue, capable of resolution by lay persons without expert testimony, of whether the hospital had been negligent in failing to heed those warnings, which indicated that the contents should not be used in such an operation. We agree with the court's ruling on the first claim, but disagree with its rulings on the amendment and the motion for summary judgment. Accordingly, we reverse the judgment and remand the case for further proceedings.

The documents available to the court in considering the motion for summary judgment indicate that the plaintiff at trial would be able to present evidence to

---

[1] The court also granted a motion of the defendant Lange for a summary judgment against the plaintiff. No appeal has been taken from that judgment.

establish that on April 22, 1985, Gayle Bourquin was admitted to St. Francis Hospital for removal of a cholesteatoma[2] above her right ear. On the following day Lange surgically removed the cholesteatoma and repaired the dura mater[3] around her brain with a graft of commercially prepared dura mater taken from a cadaver. This human tissue material, marketed under the trade name Lyodura, was processed and packaged by the defendant B. Braun Melsungen (Melsungen),[4] a German corporation, and was distributed by the defendant Tri Hawk International, Inc. (Tri Hawk),[5] a Canadian corporation. From 1982 through 1985, St. Francis Hospital made several purchases of Lyodura from Tri Hawk, and the Lyodura that was used in the course of the operation on Gayle Bourquin was provided by the hospital. The plaintiff claims that the boxes containing Lyodura that Melsungen shipped to Tri Hawk bore three imprints: "For Investigational Use Only," "For Use in Canada Only," and "Laboratory Sample—For Testing Only." He claims that Tri Hawk made no alteration of these warnings before shipping the boxes of Lyodura to the hospital.

About nineteen months after her operation, Gayle Bourquin began to develop symptoms of Creutzfeldt-Jacob disease (CJD), which produces a rapidly progressing dementia, disorientation and other neurological effects that inevitably result in death. She was admitted

[2] A cholesteatoma is "[a] kind of cyst or cystlike tumor affecting mainly the middle ear . . . but sometimes also the bone of the mastoid, the external ear canal, the spinal cord, or the brain." 1 J. Schmidt, Attorneys' Dictionary of Medicine (1995), p. C-179.

[3] The dura mater is "[t]he outermost and toughest of the three membranes (meninges) enveloping the brain and spinal cord." 1 J. Schmidt, Attorneys' Dictionary of Medicine (1995), p. D-159.

[4] The original complaint alleged a product liability claim against Melsungen. The trial court dismissed the action against that corporation for lack of personal jurisdiction.

[5] The plaintiff obtained a default for failure to appear against Tri Hawk and a judgment for $3,167,829.26.

to Hartford Hospital on January 3, 1987. A diagnosis of "suspect" CJD was made when she was discharged on January 9, 1987. She died on March 4, 1987. The plaintiff timely disclosed that a physician specializing in neurology would testify at trial that in his opinion the decedent's death was caused by CJD, which she contracted from an infectious Lyodura graft used in the course of her operation on April 23, 1985.

I

The plaintiff's claim that he should have been permitted to make a late disclosure of an expert witness on the subject of hospital standards relating to the procurement and investigation of human tissue to be used in operations must be determined on the basis of an abuse of discretion standard. "A trial court's decision on whether to impose the sanction of excluding the testimony of a party's expert witness rests within the court's sound discretion." *Pool* v. *Bell*, 209 Conn. 536, 541, 551 A.2d 1254 (1989); *Yale University School of Medicine* v. *McCarthy*, 26 Conn. App. 497, 500–501, 602 A.2d 1040 (1992). "The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented." *Mulrooney* v. *Wambolt*, 215 Conn. 211, 222, 575 A.2d 996 (1990)

Practice Book § 220 (D)[6] requires any plaintiff expecting to call an expert witness at trial to disclose

[6] Prior to the amendment that became effective on October 1, 1995, Practice Book § 220 (D) provided: "In addition to and notwithstanding the provisions of subsections (A), (B) and (C) of this section, any plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within 60 days from the date the case is claimed to a trial list. Each defendant shall disclose the names of his or her experts in like manner within 120 days from the date the case is claimed to a trial list. If disclosure of the name of any expert expected to testify at trial is not made in accordance with

his name, the subject matter of his testimony, the substance of the facts and opinions he will give, and a summary of the grounds for each opinion "within 60 days from the date the case is claimed to the trial list." If the plaintiff fails to disclose the name of any expert witness expected to testify at trial in accordance with that rule, "such expert shall not testify except in the discretion of the court for good cause shown." Practice Book § 220 (D).

It is appropriate to review the circumstances confronting the trial court at the time it denied the plaintiff's motion to disclose his belatedly discovered expert on February 22, 1993. This action was commenced on June 2, 1988. On June 7, 1988, interrogatories were served on the plaintiff seeking, inter alia, the names of the expert witnesses he intended to call at the trial and the substance of their testimony. In response thereto, the plaintiff made a timely disclosure of the name of a physician, referred to as the "state epidemiologist," who has not thereafter been mentioned as an expert witness. The plaintiff claimed the case to the jury trial list on June 22, 1992. On August 31, 1992, a motion to preclude the plaintiff from presenting any expert testimony was filed for his failure to name his expert witnesses in accordance with Practice Book § 220 (D). The trial court denied the motion at a hearing on September 14, 1992, and allowed the plaintiff until December 14, 1992, to disclose his experts. The plaintiff filed a supplemental disclosure on November 24, 1992, in which he named two expert witnesses, a physician specializing in neurology to testify that Gayle Bourquin's death resulted from CJD contracted from the Lyodura graft used in the course of her surgery, and an economist to testify to the value of her earning capacity.

this subsection, or if an expert witness who is expected to testify is retained or specially employed after that date, such expert shall not testify except in the discretion of the court for good cause shown."

On January 5, 1993, the defendant hospital moved to preclude the plaintiff from calling at trial any expert witnesses not disclosed prior to the deadline of December 14, 1992. At a hearing on January 18, 1993, concerning the filing of a motion for summary judgment, the plaintiff admitted that he still had no expert witness available to testify on the applicable standards of care for a hospital or a neurosurgeon. On February 8, 1993, however, he moved for permission to disclose the name of a neurosurgeon to provide expert testimony on those subjects. The affidavit supporting the plaintiff's motion indicates that his attorney had contacted fourteen physicians before finding one who was willing to testify in this case.

On February 22, 1993, the motion to preclude and the motion to disclose were argued at length and decided adversely to the plaintiff. The court also denied a motion for reconsideration and articulation that he filed afterwards. During the argument of the motions to preclude and to disclose, the court expressed the view that, when the plaintiff admitted at the hearing on January 18, 1993, that he still had no witness to testify on the standard of care, the case had "passed the point where there should be further opportunity for any expert to come into this case." The plaintiff never moved to extend the December 14, 1992 deadline for disclosing an expert witness. The court concluded that the circumstance that the plaintiff happened to find an expert after the deadline had passed did not constitute good cause.

We conclude that there was no abuse of discretion on the part of the trial court in refusing to grant the plaintiff's motion for late disclosure of an expert witness. The case had been pending for almost five years. The affidavit supporting the motion for late disclosure indicates that the first contact of the plaintiff with any physician occurred on January 27, 1992, approximately three and one-half years after commencement of the

action. Although this was a complex case involving jurisdictional problems with respect to two foreign corporations, on which considerable time was spent, there is no good reason for not having started the search for an expert witness on the standards of care involved much earlier. To be meaningful, extensions of time that establish dates for completing procedural steps necessary to bring a case to trial must be enforced with reasonable strictness to ensure the movement of cases through the judicial system. Parties have the right to assume that, when such a deadline has passed without compliance, no further extension of the time to comply will be granted, except under those extraordinary circumstances constituting good cause. The trial court could reasonably have concluded that the plaintiff's affidavit supporting his motion for late disclosure was insufficient to justify a finding of good cause.

## II

The plaintiff's second claim, that the trial court should have allowed a proposed amendment to his complaint relating to the failure of the hospital to heed warnings on the box in which the Lyodura was received, is also governed by the abuse of discretion standard. "Rulings on motions to amend pleadings lie in the sound discretion of the court but that discretion is a legal discretion and is subject to review." *Wesson* v. *F. M. Heritage Co.*, 174 Conn. 236, 239, 386 A.2d 217 (1978) " 'In determining whether there has been an abuse of discretion, much depends on the circumstances of each case. Factors that should be considered include unreasonable delay, fairness to the opposing parties and the negligence of the party offering the amendment.' " Id., 240.

On March 8, 1993, after the trial court had denied his motion for late disclosure of an expert witness, the plaintiff filed a request to revise his complaint by adding

the following specifications of negligence directed against the defendant hospital and its agents: "[I]n that the box in which the Lyodura came bore the designations 'For Investigational Use Only' and 'For Use in Canada Only'; in that defendant's use of Lyodura when its packaging bore the designations 'For Investigational Use Only' and 'For Use in Canada Only' manifests gross want of care and skill . . . ." The complaint, as previously revised on September 18, 1990, specified only a negligent failure (1) "properly to investigate the source of the commercially prepared human dura mater material [and] . . . the procedures under which said commercially prepared human tissue was obtained, processed and put into the stream of commerce"; (2) "to purchase said commercially prepared human tissue in accordance with standards for tissue banking . . . from an American source which was subject to standards of the American Association of Tissue Banks"; (3) "to handle, store and dispense said tissue in accordance with said standards, and of due care"; and (4) "to exercise the care of reasonably prudent persons under the circumstances." The court denied the proposed amendment on the ground that "the addition of such allegations at this late stage in the action substantially changed the nature of the plaintiff's claims and thus would be prejudicial to the defendants."

We agree with the plaintiff that the amendment would not necessarily have resulted in delay of the trial, which was scheduled to begin approximately six months later, nor would it have modified significantly the claims of negligence in the previously revised complaint. In earlier proceedings the hospital had learned of the plaintiff's claims regarding the warnings on the Lyodura boxes. An affidavit signed by the managing director of Melsungen in Germany on March 4, 1991, states that "each package of Lyodura shipped to Tri Hawk by Braun contained an imprint, 'For Use in Canada Only,' as evi-

denced by Attachment A." That attachment includes the quoted designation and, beneath it, another, "For Investigational Use Only." At a deposition of the president of Tri Hawk taken in Montreal on December 9, 1991, attended by all counsel, the plaintiff referred to the imprints on the outside of a package of Lyodura in seeking to ascertain whether any deletion had been made by Tri Hawk.

In responding on January 22, 1992, to the plaintiff's request for admissions pursuant to Practice Book § 239, the hospital "denied" that the packages of Lyodura it had received, including the one used in the operation on the plaintiff's decedent, were labeled, "For Investigational Use Only." Section 239 requires that a responding party "truthfully admit or deny the matter" that is the subject of the inquiry, unless reasons are given for the inability to do so. The hospital did not select the latter option for lack of sufficient information to respond "truthfully." The hospital, therefore, must have been aware of the claim involving the warnings on the Lyodura boxes for more than one year before the amendment was offered. Accordingly, no additional time to investigate that claim would have been needed.

Even without the amendment, evidence of the warnings on the Lyodura boxes would have been relevant to prove the plaintiff's claim of negligence in failing to investigate the source of the Lyodura tissue the hospital furnished for operations on its premises. The presence of such warnings would be a material consideration in deciding whether reasonable care would have required the hospital to make some inquiry as to the source of the tissue. The hospital must have realized long before the proposed amendment the import of the claimed imprints on the Lyodura boxes with respect to the allegation of failure to investigate the source of the tissue used in operations conducted at the hospital.

"It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same . . . ." *Gallo* v. *G. Fox & Co.*, 148 Conn. 327, 330, 170 A.2d 724 (1961). Furthermore, since the unamended complaint contained a general allegation that the hospital had "failed to exercise the care of reasonably prudent persons under the circumstances," the door had been left open to the proof of any acts that might reasonably tend to prove negligence in the context of the facts pleaded. *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 399, 363 A.2d 160 (1975). The failure to seek a more specific statement may constitute a waiver of the right to obtain a more precise description of the negligence charged. Id., 400; *Doerr* v. *Woodland Transportation Co.*, 105 Conn. 689, 692–93, 136 A. 693 (1927).

We also conclude that the plaintiff offered his amendment in timely fashion, despite the fact that the case had been pending for almost five years. The original allegations of negligence against the hospital had been drafted in the expectation that a qualified expert witness would testify at trial concerning the standards applicable to hospitals in procuring, storing and furnishing human tissue to be used in operations. When the ruling of the court precluded such testimony, the plaintiff realized that the focus of his claim had to be the warnings printed on the boxes containing the Lyodura, because he had no other evidence to prove negligence. He filed his request to revise his specifications of negligence approximately two weeks after the denial of his motion for late disclosure of an expert witness.

The trial court should have allowed the proposed amendment because it did not enlarge the original specifications of negligence or inject new facts into the case of which the defendant was unaware. The same evidence would have been admissible in support of the

allegation that the hospital was negligent in failing to investigate the source of the Lyodura. The request to amend was filed promptly after the need for it became apparent, and no delay of the trial would have been required to enable the hospital to prepare its defense.

## III

After its motion to preclude any testimony in behalf of the plaintiff from experts not previously disclosed had been granted, the hospital, on March 8, 1993, filed a motion for summary judgment, claiming that, without expert testimony, the plaintiff would be unable to establish the standard of care applicable to a hospital and to prove a deviation from that standard causally related to the death of Gayle Bourquin. At the hearing on the motion, the plaintiff contended that the allegations of negligence relied on—the hospital's disregard of the imprints on the Lyodura boxes delivered to the hospital and its failure to investigate the source of that substance in the light of those warnings—were not so complex as to require expert testimony. The trial court disagreed with the plaintiff's argument and granted the hospital's motion.

The criteria for granting a motion for summary judgment are well established. "The party moving for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which under applicable principles of substantive law, entitle him to judgment as a matter of law. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." *Dougherty* v. *Graham*, 161 Conn. 248, 250, 287 A.2d 382 (1971). The test is whether the moving party would be entitled to a directed verdict if the uncontroverted essential facts contained in the supporting affidavits or other documents were established at trial. *Spencer* v.

*Good Earth Restaurant Corp.*, 164 Conn. 194, 198, 319 A.2d 403 (1972). " 'In Connecticut, a directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed.' " Id.

This court has approved the grant of a summary judgment in a medical malpractice case when, as in this case, it is evident that the plaintiff will be unable to produce at trial an expert witness to testify regarding the applicable standard of care. *Guzze* v. *New Britain General Hospital*, 16 Conn. App. 480, 484–85, 547 A.2d 944, cert. denied, 209 Conn. 823, 552 A.2d 430 (1988). We have also upheld the setting aside of a verdict when such testimony has been precluded by an order of the trial court because of the plaintiff's untimely disclosure of the name of his expert. *Perez* v. *Mount Sinai Hospital*, 7 Conn. App. 514, 509 A.2d 552 (1986). "It is well settled that the plaintiff cannot prevail unless there was positive evidence of an expert nature from which the jury could reasonably conclude that the defendant was negligent, except where there is manifest such gross want of care or skill as to afford, of itself, an almost conclusive inference of negligence that the testimony of an expert is not necessary." *Puro* v. *Henry*, 188 Conn. 301, 305, 449 A.2d 176 (1982). The plaintiff claims that his case falls within the exception, because the acts of negligence on which he now relies are the failure of the hospital to heed the warnings printed on the Lyodura boxes and to investigate their significance.

In this state, decisions indicating that the exception to the general requirement of expert testimony in medical malpractice cases might be applicable have involved foreign objects discovered in the body of a patient after surgery or abnormal injuries sustained during surgery. Id., 308 (needle found in patient after hernia operation); *Console* v. *Nickou*, 156 Conn. 268, 274–75, 240 A.2d 895

(1968) (needle left in patient after delivery of child); *Allen* v. *Giuliano*, 144 Conn. 573, 575, 135 A.2d 904 (1957) (lacerations to patient's leg in removal of cast); *Slimak* v. *Foster*, 106 Conn. 366, 370, 138 A. 153 (1927) (piece of surgical instrument left in patient after nose operation). In other jurisdictions, courts have found the jurors' common knowledge adequate for understanding the basis for the malpractice claim without expert testimony in a variety of circumstances. *LaRoche* v. *United States*, 730 F.2d 538, 541 and n.5 (8th Cir. 1984) (placing permanent fillings in teeth that dentist should have known were infected); *Carlsen* v. *Javurek*, 526 F.2d 202, 207–208 (8th Cir. 1975) (dispute as to whether nurse-anesthetist had used anesthetic that surgeon had instructed her not to use); *Gault* v. *Poor Sisters of St. Frances Seraph of the Perpetual Adoration, Inc.*, 375 F.2d 539, 557 (6th Cir. 1967) (administration of wrong medication because containers appeared similar).

The record indicates that Tri Hawk, the Canadian distributor of Lyodura, inquired in 1979 about applying for an investigational device exemption (IDE) for Lyodura from the Food and Drug Administration (FDA) in order to market that product in the United States. It appears that Melsungen, the producer, was aware of the attempt to make Lyodura available in this country. Such an exemption "permits a device that otherwise would be required to comply with a performance standard or to have premarket approval to be shipped lawfully for the purpose of conducting investigations of that device." 21 C.F.R. § 812.1 (a) (1995). The FDA requires that the package containing an investigational device be properly labeled to include this statement: " 'CAUTION-Investigational device. Limited by Federal (or United States) law to investigational use.' " 21 C.F.R. § 812.5 (a) (1995). Before any IDE may be used on a patient, an informed consent must be obtained. 21 C.F.R. §§ 50.20, 812.100 and 812.150 (a) (5) (1995).

Melsungen terminated its efforts to introduce Lyo-
dura into the United States and imposed a territorial
limitation in its agreement with Tri Hawk limiting the
distribution of that product to Canada. Although the
Lyodura boxes are claimed to have borne the imprint,
"For Use in Canada Only," Tri Hawk, during the early
1980s, apparently without having complied with the
FDA requirements for an IDE permit, sold and shipped
packages of Lyodura to various hospitals in the United
States with that imprint as well as "For Investigational
Use Only" and "Laboratory Sample—For Testing Only."
The record does not indicate whether the latter designa-
tions were intended to be equivalent to the caution
required by the FDA or are related to similar labeling
requirements imposed by Canadian authorities. In a
letter to Tri Hawk responding in 1979 to its request
concerning an IDE for Lyodura, the FDA explicitly
warned that "[a]ny commercial distribution of this prod-
uct prior to our approval of an application for premarket
approval . . . would be regarded as a violation of the
Federal Food, Drug, and Cosmetics Act." The letter also
advised that, if Tri Hawk should obtain approval of an
IDE for Lyodura, any shipment of the product into the
United States must be labeled to state that it is "For
Investigational Use Only."

We conclude that the plaintiff's claim that the hospital
was negligent in failing to investigate the source of the
Lyodura it received from Tri Hawk, in the light of the
alleged warnings on the packages, does not present an
"esoteric or uniquely medical issue" requiring expert
testimony for its determination. See *Badrigian* v. *Elm-
crest Psychiatric Institute, Inc.*, 6 Conn. App. 383, 387,
505 A.2d 741 (1986). Whether reasonably prudent hospi-
tal personnel would have been alerted by the imprints
to inquire about their significance is a question that can
be resolved on the basis of the common knowledge
that jurors possess. The failure to observe or heed a

warning is not a novel basis for finding negligence. See *Buck* v. *United States*, 433 F. Sup. 896, 900 (M.D. Fla. 1977).

Similarly, the requisite causal relationship between the hospital's alleged negligence and the death of Gayle Bourquin is capable of resolution without any expert testimony other than that of the expert whose opinion on the cause of death has been properly disclosed. That opinion indicates that the decedent contracted CJD from an infectious Lyodura mater graft used in the course of her operation. If the jurors should find that a reasonable inquiry about the significance of the imprints would have led the hospital to discover that the use of Lyodura on a patient in this country was a violation of federal law, they could reasonably conclude that the hospital would have supplied some alternative substance for the operation that did not violate federal law. Thus, a finding that failure to heed the warnings on the boxes was the proximate cause of death would not be unsupported by the evidence.

We are convinced, therefore, that the trial court should not have granted the hospital's motion for summary judgment because of the plaintiff's inability to provide expert testimony on the appropriate standard of care for a hospital in purchasing human tissue for use in operations performed by neurosurgeons.

The judgment in favor of the defendant hospital is reversed and the case is remanded for further proceedings.

In this opinion the other judges concurred.