ANTHONY D. BOONE, ADMINISTRATOR (ESTATE OF KYLE KALIK BOONE), ET AL. *v.* WILLIAM W. BACKUS HOSPITAL ET AL.
(SC 17204)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Leheny, Js.

Argued October 26, 2004—officially released January 25, 2005

*Joseph A. Moniz*, for the appellants (plaintiffs).

*Jeffrey F. Buebendorf*, for the appellee (named defendant).

*Opinion*

SULLIVAN, C. J. This appeal arises from the tragic death of a four year old child following his treatment for an earache. The plaintiff, Anthony D. Boone, on his own behalf and as administrator of the estate of his son Kyle Kalik Boone, appeals from the judgment of the trial court rendering summary judgment in favor of the named defendant, William W. Backus Hospital. The plaintiff claims on appeal that the trial court improperly determined that his claims alleging negligence and recklessness were, in fact, claims alleging medical malpractice and, therefore, that he was required to present expert testimony to establish proximate causation. We disagree and affirm the judgment of the trial court.

The record reveals the following facts and procedural history relevant to this appeal. On December 22, 1999, at approximately 5:30 p.m., Heidi Hansen brought her four year old son, the plaintiff's decedent (decedent), to the hospital because he was complaining of pain in his right ear and she observed pus oozing from the ear. A physician at the hospital diagnosed the decedent with "right purulent otitis media" and treated him with two fifty milligram injections of Rocephin IM, an antibiotic, and a teaspoon of Tylenol with Codeine Elixir, a pain reliever. After receiving this medication, the decedent vomited, began to sweat, and his complexion turned white. A hospital nurse informed Hansen that the symptoms were caused by the injections, but that it was safe to take him home. While Hansen and the decedent were outside waiting for a taxicab, he began to vomit violently. Hansen brought the decedent back inside the hospital and sought medical assistance. A hospital nurse gave Hansen a basin and a washcloth, informed

her that nothing more could be done, and instructed them to leave the hospital immediately. Hansen brought the decedent back outside, where he continued to vomit violently and was unable to stand upright. At the insistence of a taxicab driver, Hansen brought the decedent back inside the hospital for medical assistance. A hospital nurse instructed them to leave three times and threatened to call security if they did not do so. Hansen and the decedent left the hospital, arriving home at approximately 9:30 p.m.

By the time the decedent arrived home, he was sweating, disoriented, breathing shallowly, his muscles were limp, and he had to use the bathroom but was unable to sit upon the toilet by himself. At 9:35 p.m., the plaintiff called the hospital and reported that the decedent was vomiting, had diarrhea, and was violently ill. The hospital responded that these symptoms were caused by the medication and advised the plaintiff to lay him down in bed. The plaintiff followed the hospital's instructions, but at this point the decedent's hands were clenched, he was not breathing well, and his lips and gums were white. The plaintiff and Hansen brought the decedent back to the hospital, arriving at 11:15 p.m. At 11:24 p.m., the decedent was lethargic and did not respond to verbal commands. On December 23, 1999, at 12:10 a.m., in an attempt to revive the decedent, hospital personnel administered various medications to him and began cardiopulmonary resuscitation. These measures were unsuccessful and, at 2:44 a.m., the decedent was pronounced dead. An autopsy revealed that the cause of his death was " 'hemolysis due to [an] idiosyncratic reaction to Ceftriaxone.' "

On June 25, 2001, the plaintiff commenced the present action against the named defendant. He subsequently

filed an amended complaint[1] that alleged, in the first count, that the defendant was negligent in one or more of the following ways: (1) hiring and/or retention of its staff; (2) failing to provide adequate supervision and training of its staff; (3) failing to adequately train, educate or instruct its staff to recognize a severe allergic reaction to medication; (4) failing to warn its staff about the risks and dangers of allergic reactions; (5) failing to provide adequate and proper medical treatment; and (6) failing to respond adequately to the emergency presented on December 22, 1999, when Hansen returned to the hospital twice seeking assistance for the decedent and insisting that she leave despite his worsening condition. In the second count of the complaint, the plaintiff alleged that the defendant was reckless in one or more of the following ways: (1) failing to provide medical treatment; (2) failing to respond adequately to the emergency presented on December 22, 1999, when Hansen returned to the hospital twice seeking assistance for the decedent and insisting that they leave while his condition deteriorated; and (3) failing to consult with a physician before insisting that Hansen and the decedent leave and threatening to call security.

On August 29, 2002, the trial court entered a scheduling order that required the plaintiff to disclose any expert witnesses on or before October 26, 2002. On

---

[1] On June 25, 2001, the plaintiff filed his first complaint in the present matter, which asserted claims of negligence and recklessness against the named defendant and a nurse Jane Doe, "a registered nurse employed by the [named] defendant . . . ." The named defendant filed a motion to dismiss the complaint with respect to Jane Doe because "the [c]ourt lack[ed] personal jurisdiction over [her], since Connecticut [p]ractice does not permit actions against Jane Doe defendants." The trial court granted the named defendant's motion and entered a final judgment in favor of Jane Doe. On September 6, 2002, the plaintiff filed an amended complaint seeking recovery against only the named defendant for negligence and recklessness. It is undisputed that the amended complaint is the operative complaint for the purpose of this appeal. Hereafter, in this opinion we refer to William W. Backus Hospital as the defendant.

December 5, 2002, the plaintiff had not yet disclosed any expert witnesses and, accordingly, the defendant filed a motion to preclude future disclosures to prevent possible prejudice and delay. On March 3, 2003, the trial court granted the defendant's motion and foreclosed the plaintiff from offering expert testimony in support of his claims. The defendant then filed a motion for summary judgment, arguing that the plaintiff's complaint alleged a medical malpractice claim and that, because the plaintiff would be required to present expert testimony to prevail upon such a claim but now was precluded from doing so, no genuine issue of material fact existed.

In response to the defendant's motion for summary judgment, the plaintiff submitted the following documents to the trial court to support his recklessness and negligence claims: (1) the defendant's "Emergency Department Discharge Instructions" instructing the decedent to return to the hospital if he felt that his "condition [was] not improving (and especially if it [was] worsening)"; (2) a page of an autopsy report indicating that the final cause of the decedent's death was "hemolysis due to [an] idiosyncratic reaction to Ceftriaxone"; (3) a printout from an Internet website entitled "RxList" describing Rocephin as "ROCEPHIN (ceftriaxone sodium) FOR INJECTION"; (4) a printout from the same website detailing "warnings" and "precautions" for the use of Rocephin;[2] (5) a printout from the website listing the side effects of Rocephin; and (6) one page

---

[2] These warnings included the following: "BEFORE THERAPY WITH ROCEPHIN IS INSTITUTED, CAREFUL INQUIRY SHOULD BE MADE TO DETERMINE WHETHER THE PATIENT HAS HAD PREVIOUS HYPERSENSITIVITY REACTIONS TO CEPHALOSPORINS, PENICILLINS OR OTHER DRUGS. THIS PRODUCT SHOULD BE GIVEN CAUTIOUSLY TO PENICILLIN-SENSITIVE PATIENTS. ANTIBIOTICS SHOULD BE ADMINISTERED WITH CAUTION TO ANY PATIENT WHO HAS DEMONSTRATED SOME FORM OF ALLERGY, PARTICULARLY TO DRUGS. SERIOUS ACUTE HYPERSENSITIVITY REACTIONS MAY REQUIRE THE USE OF SUBCUTANEOUS EPINEPHRINE AND OTHER EMERGENCY MEASURES."

of the defendant's medical records for the decedent indicating his allergy to sulfa drugs and penicillin.

On September 26, 2003, the trial court issued a memorandum of decision granting the defendant's motion for summary judgment. The trial court concluded that the plaintiff's claims sounded in medical malpractice because (1) the defendant was sued in its capacity as a provider of emergency medical services, (2) the alleged negligence was of a specialized medical nature arising out of the medical professional relationship, and (3) the alleged negligence was substantially related to medical diagnoses or treatment and involved the exercise of medical judgment. The trial court recognized that, to prevail in a medical malpractice claim, the plaintiff must prove, ordinarily through expert testimony: "(1) the requisite standard of care, (2) a deviation from the standard of care and (3) a causal connection between the deviation and the claimed injury." The court held that, while expert testimony might not be necessary to establish the defendant's negligence under these circumstances, such testimony would be necessary to establish causation because the average layperson could not "equate 'hemolysis' in the autopsy report with 'pseudomembranous colitis' in the Internet materials"[3] and could not determine, "without the aid of expert testimony that if the child had been accepted back in the emergency room earlier and treated that the tragedy which resulted would not have occurred." Accordingly, the trial court rendered summary judgment in favor of the defendant. The plaintiff appealed from the trial court's judgment to the Appellate Court and we trans-

[3] The trial court stated that it had "serious question as to whether and in what way it [could] consider these Internet pages." It observed that the Internet materials "were perhaps but not clearly issued by the drug manufacturer of Rocephin" and that there were "no corroborating materials or affidavits submitted to indicate the source of [the] material, how current it was, whether in fact it came from the manufacturer, whether users received the material along with supplies of the drug."

ferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiff argues on appeal that the trial court improperly determined that his claims against the defendant were medical malpractice claims requiring expert testimony as to the proximate cause of death. He also argues that even if his claims sound in medical malpractice, expert testimony was not required to prove proximate causation because the defendant's actions constituted such gross want of care or skill as to give rise to an almost conclusive inference of negligence and fall under the doctrine of res ipsa loquitur. We disagree with the plaintiff and affirm the judgment of the trial court.

As a preliminary matter, we set forth the appropriate standard of review. "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue.

. . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]. . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *Allstate Ins. Co.* v. *Barron*, 269 Conn. 394, 405–406, 848 A.2d 1165 (2004).

I

Before addressing the plaintiff's substantive claims, we first address his argument that the trial court improperly determined that his negligence and recklessness claims were predicated solely on the defendant's failure to treat or to readmit the decedent, rather than on both its failure to treat or to readmit the decedent *and* its initial administration of Rocephin.[4] The defendant counters that "[o]nly toward the end of the process of opposing the defendant's [m]otion for [s]ummary [j]udgment did the plaintiff attempt to portray his [c]omplaint as also alleging negligence in connection with the defendant's initial decision to administer Rocephin to the decedent" and that the trial court properly construed the complaint. We agree with the plaintiff.

"[T]he interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary." (Citation omitted; internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 104, 828 A.2d 31 (2003). "[T]he modern trend, which is followed in Connecticut,

---

[4] The trial court's memorandum of decision states that "the whole case rests on the claim of failure to deliver medical services or treatment" and that "there is no claim that something was wrong with the drug administered or that the drug should not have been administered under any circumstance."

is to construe pleadings broadly and *realistically*, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id. "As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." (Internal quotation marks omitted.) *Dornfried* v. *October Twenty-Four, Inc.*, 230 Conn. 622, 629, 646 A.2d 772 (1994).

The complaint states that the decedent was diagnosed with an earache and that his condition was treated with Rocephin IM and Tylenol with Codeine Elixir. It then details the precipitous deterioration of his condition until his eventual death. The complaint alleges, inter alia, that the defendant failed to "warn its staff about the risks and dangers of allergic reactions" and failed to provide medical treatment adequately and properly to the decedent, and that these failures caused his injuries, losses and death. Thus, taken as a whole, the complaint alleges that the defendant administered prescription medication to the decedent, that he had an immediate allergic reaction to this medication, and that the defendant failed to treat this allergic reaction adequately and properly. Although the complaint does not specifically articulate the defendant's initial administration of Rocephin to the decedent as a basis for the plaintiff's negligence and recklessness claims,[5] we must

---

[5] The complaint does not allege explicitly that the defendant was aware of the decedent's allergy to penicillin or that the decedent had an allergic reaction to Rocephin. The complaint does allege, however, that the decedent had an allergic reaction to *something* and that this allergic reaction began almost immediately after the defendant administered prescription medication to him. Additionally, it is undisputed that the defendant was aware of the decedent's penicillin allergy.

construe the complaint broadly and in light of the plaintiff's general theory of recovery. Accordingly, although the complaint is not a model of clarity, we conclude that it encompasses the allegation that the defendant was negligent and reckless in its initial administration of Rocephin to the decedent.

Moreover, the defendant cannot claim surprise or prejudice by our interpretation of the plaintiff's complaint. We recognize that, in its initial memorandum in opposition to the defendant's motion for summary judgment, the plaintiff focused on the defendant's failure to readmit the decedent as the primary basis for his complaint.[6] In subsequent memoranda and documentary submissions to the trial court, however, the plaintiff explicitly argued that the defendant's initial administration of Rocephin to the decedent was an additional basis of his complaint.[7] Thus, the allegations of the complaint, coupled with the plaintiff's characterization of the complaint in his memoranda to the trial court along with the accompanying materials, put the defendant on notice that the plaintiff had included the defendant's administration of Rocephin to the decedent

---

[6] The plaintiff stated that his complaint was "based primarily upon the defendant [h]ospital's refusal to readmit/treat his son who suffered an allergic reaction to medication he had received during his admission on December 22, 1999," and that "the crux of the [p]laintiff's [c]omplaint is that the defendant's failure to readmit his son under the circumstances presented constituted 'ordinary negligence' . . . ."

[7] In the plaintiff's rebuttal memorandum, he asserted that his claims of negligence "clearly include the prescription of medication (which was the only medical treatment provided) to the decedent that caused his allergic reaction, and encompasses the staff's failure adequately to treat and/or recognize that allergic reaction." In the plaintiff's supplemental memorandum, he stated that "[t]he allegations in the [r]evised [c]omplaint clearly allege neglect on the part of the [d]efendant in administering Rocephin and failing to treat [the decedent] for a severe reaction thereto." Additionally, attached to the plaintiff's supplemental memorandum were (1) a single page of an autopsy report indicating that the decedent died of "hemolysis due to [an] idiosyncratic reaction to Ceftriaxone" and (2) various print-outs containing information about Rocephin obtained from the Rx-List website.

in his negligence and recklessness claims. Accordingly, we conclude that the trial court improperly construed the plaintiff's complaint to allege negligence and recklessness solely with respect to the defendant's failure to treat or to readmit the decedent.

## II

Having construed the proper scope of the plaintiff's complaint, we next address his claim that the trial court improperly determined that his claims of negligence and recklessness constituted medical malpractice claims requiring expert testimony. Specifically, the plaintiff argues that the defendant's actions in administering Rocephin to the decedent and subsequently refusing to treat or to readmit him were so egregious that an average person could find them to be negligent and reckless on the basis of common knowledge and experience. We disagree.

"The classification of a negligence claim as either medical malpractice or ordinary negligence requires a court to review closely the circumstances under which the alleged negligence occurred. [P]rofessional negligence or malpractice . . . [is] defined as the *failure of one rendering professional services* to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . . Furthermore, malpractice presupposes some *improper conduct in the treatment or operative skill* [or] . . . the failure to exercise requisite medical skill . . . . From those definitions, we conclude that the relevant considerations in determining whether a claim sounds in medical malpractice are whether (1) the defendants are sued in their capacities as medical professionals, (2) the alleged negligence is of a specialized medical nature that arises out of the medical pro-

fessional-patient relationship, and (3) the alleged negligence is substantially related to medical diagnosis or treatment and involved the exercise of medical judgment." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254, 811 A.2d 1266 (2002).

The plaintiff concedes that his claims against the defendant satisfy the first element of a medical malpractice claim because the defendant is being sued in its capacity as an institution providing medical care. The plaintiff disputes, however, that the defendant's alleged negligent and reckless conduct was of a specialized medical nature. He further contends that while the alleged negligence was substantially related to medical diagnosis or treatment, it did not involve the exercise of medical judgment.

A

We first address the plaintiff's claim that his allegation that the defendant negligently and recklessly administered Rocephin to the decedent is not a medical malpractice claim because the administration of the drug was not of a specialized medical nature and did not involve the exercise of medical judgment. The plaintiff argues that expert testimony is not necessary because Rocephin contains penicillin and a lay jury does not need expert testimony to determine that penicillin should not be given to a patient with a penicillin allergy. We reject this argument because the plaintiff failed to provide the trial court with any evidence that Rocephin contains penicillin.[8] Moreover, we conclude that the

---

[8] The plaintiff's Internet materials, assuming that they were properly before the trial court in ruling on the defendant's motion for summary judgment, do not establish that Rocephin contains penicillin. See footnote 3 of this opinion; see also *Great Country Bank* v. *Pastore*, 241 Conn. 423, 436, 696 A.2d 1254 (1997) ("[o]nly evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment" [internal quotation marks omitted]). They merely warn that the drug should "be given cautiously to penicillin-sensitive patients." See footnote 2 of this opinion. Additionally, the plaintiff, in his brief, quotes the following language from

prescription of medication to a patient is inherently of a specialized medical nature because only licensed health care professionals may do so. See General Statutes § 20-14c (3).[9] Additionally, the prescription of medication inherently involves medical judgment because, as the defendant argued in its brief to this court, the prescribing physician "must determine which medication, under the particular circumstances involved, is most likely to provide the optimal benefit with the least risk of complications."

Because the administration of prescription medication is of a specialized medical nature and requires the exercise of medical judgment, we conclude that the trial court properly determined that the plaintiff's claim that the defendant negligently and recklessly administered Rocephin to the decedent sounds in medical malpractice. See *Gold* v. *Greenwich Hospital Assn.*, supra, 262 Conn. 255 (plaintiff's claim that hospital negligently discharged patient after administering medication was medical malpractice claim); *Levett* v. *Etkind*, 158 Conn. 567, 573–76, 265 A.2d 70 (1969) (plaintiff's claim that physician negligently permitted elderly patient to dress herself was medical malpractice claim).

---

the Physicians' Desk Reference to support the proposition that Rocephin contains penicillin: "Before therapy with Rocephin is instituted, careful inquiry should be made to determine whether the patient has had previous hypersensitivity reactions to . . . penicillins or other drugs. This product should be given cautiously to penicillin-sensitive patients. . . ." We note that the plaintiff failed to present this excerpt from the Physicians' Desk Reference to the trial court and also failed to reproduce it in the appendix of his brief to this court. In any event, the above quoted language, like that in the Internet materials, merely encourages "caution" in the administration of Rocephin to penicillin-sensitive patients and in no way supports the plaintiff's proposition that Rocephin *contains* penicillin. Thus, the trial court reasonably could not have found that Rocephin contains penicillin.

[9] General Statutes § 20-14c (3) provides that " '[p]rescribing practitioner' means a physician, dentist, podiatrist, optometrist, physician assistant, advanced practice registered nurse, nurse-midwife or veterinarian licensed by the state of Connecticut and authorized to prescribe medication within the scope of such person's practice."

## B

The plaintiff next argues that the trial court improperly determined that his claim that the defendant negligently and recklessly refused to treat or to readmit the decedent, despite his obvious symptoms of an adverse reaction to medication, was a medical malpractice claim. We disagree.

The plaintiff first argues that the defendant's refusal to treat or to readmit the decedent was not of a specialized medical nature because any layperson could discern that the decedent was having an allergic reaction and the defendant's own discharge instructions urged patients to return to the emergency room if their condition did not improve or if it worsened. The defendant counters that "the determination by a healthcare provider as to whether certain symptoms are an uncomfortable but acceptable reaction to medication such that a patient may safely return home or whether the symptoms are consistent with a life threatening reaction is unquestionably a decision of a specialized nature arising out of the professional-patient relationship." We agree with the defendant that the determination by emergency medical personnel of the nature or severity of a patient's reaction to prescribed medication is of a specialized medical nature arising out of the professional-patient relationship. The issue in the present matter, whether the vomiting was a typical reaction to the drugs received by the decedent or an indication of a condition requiring readmission to the hospital, is not within the knowledge of a typical layperson. Cf. *State* v. *Orsini*, 155 Conn. 367, 372, 232 A.2d 907 (1967) (expert testimony not necessary for "obvious or simple matters or everyday life" such as pregnancy or amputation).

The plaintiff next argues that the defendant's refusal to readmit the decedent was not substantially related to medical diagnosis or treatment and did not involve

the exercise of medical judgment because "the conditions exhibited by [the decedent] were more akin to a patient with a visible injury, such as a bleeding wound or broken bone, being refused treatment in an emergency room." We disagree that this case can be analogized to the summary denial of treatment for an obvious injury. In the present matter, the defendant admitted the decedent and treated his earache by administering prescription medication. The defendant made the subsequent determination that the ensuing symptoms were consistent with a normal response to the medication and did not require further treatment or readmission. Thus, the defendant's determination was intrinsically related to its earlier diagnosis and treatment of the decedent and required the exercise of medical judgment concerning the normalcy and severity of his reaction to prescription medication. Whether that determination was sound requires medical judgment. Because the decision by emergency medical personnel concerning whether a patient's adverse reaction to prescription medication requires further treatment or readmission is of a specialized medical nature and requires the exercise of medical judgment, we conclude that the trial court properly found that the plaintiff's claim that the defendant negligently and recklessly refused to treat or to readmit the decedent sounds in medical malpractice. See *Gold* v. *Greenwich Hospital Assn.*, supra, 262 Conn. 255; *Levett* v. *Etkind*, supra, 158 Conn. 573–76.

III

The plaintiff next claims that, even if his negligence and recklessness claims sound in medical malpractice, the trial court improperly determined that the defendant's conduct was not grossly negligent and, therefore, that the plaintiff was required to present expert testimony in support of his medical malpractice claim. Specifically, the plaintiff contends that the defendant's administration of Rocephin to the decedent and subse-

quent refusal to treat or to readmit him exhibited such gross want of care or skill that expert testimony was not necessary to establish causation. We disagree.

"[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, supra, 262 Conn. 254–55. Generally, the plaintiff must present expert testimony in support of a medical malpractice claim because the requirements for proper medical diagnosis and treatment are not within the common knowledge of laypersons. See, e.g., *Doe* v. *Yale University*, 252 Conn. 641, 686–87, 748 A.2d 834 (2000); *Levett* v. *Etkind*, supra, 158 Conn. 573–74. "An exception to the general rule [requiring] expert medical opinion evidence . . . is when the medical condition is obvious or common in everyday life. . . . Similarly, expert opinion may not be necessary as to causation of an injury or illness if the plaintiff's evidence creates a probability so strong that a lay jury can form a reasonable belief. . . . Expert opinion may also be excused in those cases where the professional negligence is so gross as to be clear even to a lay person." (Citations omitted; internal quotation marks omitted.) *Kalams* v. *Giacchetto*, 268 Conn. 244, 248 n.4, 842 A.2d 1100 (2004).

"In this state, decisions indicating that the exception to the general requirement of expert testimony in medical malpractice cases might be applicable have involved foreign objects discovered in the body of a patient after surgery or abnormal injuries sustained during surgery. [*Puro* v. *Henry*, 188 Conn. 301, 308, 449 A.2d 176 (1982)] (needle found in patient after hernia operation); *Console* v. *Nickou*, 156 Conn. 268, 274–75, 240 A.2d 895 (1968) (needle left in patient after delivery of child); *Allen* v. *Giuliano*, 144 Conn. 573, 575, 135 A.2d 904

(1957) (lacerations to patient's leg in removal of cast); *Slimak* v. *Foster*, 106 Conn. 366, 370, 138 A. 153 (1927) (piece of surgical instrument left in patient after nose operation). In other jurisdictions, courts have found the jurors' common knowledge adequate for understanding the basis for the malpractice claim without expert testimony in a variety of circumstances [where the defendant's breach of the standard of care was obvious]. *LaRoche* v. *United States*, 730 F.2d 538, 541 and n.5 (8th Cir. 1984) (placing permanent fillings in teeth that dentist should have known were infected); *Carlsen* v. *Javurek*, 526 F.2d 202, 207–208 (8th Cir. 1975) (dispute as to whether nurse-anesthetist had used anesthetic that surgeon had instructed her not to use); *Gault* v. *Poor Sisters of St. Frances Seraph of the Perpetual Adoration, Inc.*, 375 F.2d 539, 557 (6th Cir. 1967) (administration of wrong medication because containers appeared similar)." *Bourquin* v. *B. Braun Melsungen*, 40 Conn. App. 302, 314–15, 670 A.2d 1322, cert. denied, 237 Conn. 909, 675 A.2d 456 (1996).

Although the circumstances surrounding the untimely death of the decedent are disturbing and tragic, nevertheless, we must conclude that the conduct of the defendant's personnel in diagnosing and treating the decedent does not meet the high threshold of egregiousness necessary to fall within the gross negligence exception. The plaintiff relies upon *Bourquin* v. *B. Braun Melsungen*, supra, 40 Conn. App. 314–17, and *Shegog* v. *Zabrecky*, 36 Conn. App. 737, 654 A.2d 771, cert. denied, 232 Conn. 922, 656 A.2d 670 (1995), to support his argument that his medical malpractice claim falls within the gross negligence exception. We find the facts of *Bourquin* and *Shegog* to be inapposite. In both cases, expert and circumstantial evidence presented by the plaintiff was sufficient for a lay jury to determine, as a matter of common knowledge, that there was an obvious and egregious violation of an established stan-

dard of care and that this violation proximately caused the decedent's injuries. See *Bourquin* v. *B. Braun Melsungen,* supra, 305–306, 314–17 (jury capable of considering, without expert testimony, claim that hospital negligently permitted grafting of human tissue material upon decedent that was clearly labeled "For Investigational Use Only," "For Use in Canada Only," and "Laboratory Sample—For Testing Only"); *Shegog* v. *Zabrecky,* supra, 747–48 (defendant chiropractor, not licensed to issue prescriptions, grossly negligent in prescribing medication not approved by Federal Drug Administration to decedent, who was undergoing cancer treatment).

In the present matter, there was insufficient evidence from which a lay jury could conclude, on the basis of its own common knowledge, that the defendant's conduct constituted an obvious and egregious violation of an established standard of care and that this violation proximately caused the decedent's injuries and death. See, e.g., *Krause* v. *Bridgeport Hospital,* 169 Conn. 1, 6–7, 362 A.2d 802 (1975) (expert testimony necessary where decedent's shoulder was dislocated during administration of barium enema); *Ardoline* v. *Keegan,* 140 Conn. 552, 556–57, 102 A.2d 352 (1954) (expert testimony necessary where defendant physician prescribed medication to which decedent had allergic reaction, and defendant could not be contacted).

Expert testimony was necessary in this case to establish when, and in what manner, it is safe to administer Rocephin to a patient with a penicillin allergy. Even if it is assumed, arguendo, that the plaintiff's Internet materials were properly before the trial court in ruling on the defendant's motion for summary judgment; see footnote 3 of this opinion; they merely established that Rocephin "should be given *cautiously* to penicillin-sensitive patients"; (emphasis added) see footnote 2 of this opinion; and do not establish, as the plaintiff argues,

that Rocephin should *never* be given to penicillin-sensitive patients. It is unclear, without the aid of expert testimony, what the term "cautiously" means in this context and whether the defendant exercised the appropriate level of caution under these circumstances. See, e.g., *Sherman* v. *Bristol Hospital, Inc.*, 79 Conn. App. 78, 89–90, 828 A.2d 1260 (2003) (expert testimony necessary to establish frequency with which defendant should have monitored decedent after it administered morphine to him despite his obesity and history of heart problems).

In addition, expert testimony was necessary to establish whether the decedent's symptoms, first exhibited after he received the Rocephin and Tylenol with Codeine Elixer, were consistent with an uncomfortable but nevertheless normal reaction to the medication or instead were indicative of a serious allergic reaction requiring his readmission and treatment.[10] Cf. *State* v.

[10] The plaintiff's Internet materials arguably could establish the appropriate standard of care in the present matter. These materials provide that: "Pseudomembranous colitis has been reported with nearly all antibacterial agents, including ceftriaxone [Rocephin] and may range in severity from mild to life-threatening. Therefore, it is important to consider this diagnosis in patients who present with diarrhea subsequent to the administration of antibacterial agents. . . . After the diagnosis of pseudomembranous colitis has been established, appropriate therapeutic measures should be initiated. Mild cases of pseduomembranous colitis usually respond to drug discontinuation alone. In moderate to severe cases, consideration should be given to management with fluid and electrolytes, protein supplementation and treatment with an antibacterial drug . . . ." Thus, these materials establish that diarrhea is indicative of a possibly serious reaction to Rocephin, namely pseudomembranous colitis, and that this reaction should be considered if a patient presents with diarrhea after administration of the drug. But, the decedent's parents did not notify the defendant that the decedent was experiencing diarrhea until he had returned home at 9:35 p.m., approximately forty-five minutes after the administration of Rocephin and right before the decedent "sped back to the defendant [h]ospital." Even if these materials can be construed to establish an appropriate standard of care, however, they do not establish that the defendant's conduct breached the standard of care. Assuming that diarrhea is always or usually indicative of pseudomembranous colitis, it is unclear, without the aid of expert testimony, what the "appropriate therapeutic measures" might be under these particular

*Nunes*, 260 Conn. 649, 669, 800 A.2d 1160 (2002) (expert testimony concerning effects of chloral hydrate sufficient for jury to find that "the effects felt by the victim were consistent with those effects that one would expect after ingesting chloral hydrate").

Additionally, in order to prevail upon his medical malpractice claim, the plaintiff was required to establish that the defendant's negligent conduct was a cause in fact and the proximate cause of the decedent's injuries and death. See, e.g., *Poulin* v. *Yasner*, 64 Conn. App. 730, 735, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001). "The test for cause in fact is [w]ould the injury have occurred were it not for [the defendant's] negligent . . . conduct . . . ? Proximate cause is defined as [a]n actual cause that is a substantial factor in the resulting harm . . . . The substantial factor test, in truth, reflects the inquiry fundamental to all proximate cause questions; that is, whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." (Citations omitted; internal quotation marks omitted.)

circumstances. Moreover, as discussed in part III of this opinion, it is not clear that the decedent's injuries and death were caused by the defendant's administration of Rocephin.

Alternatively, the plaintiff alleges that expert testimony was not necessary in the present matter to establish the defendant's breach of the applicable standard of care because the defendant's breach can be inferred from its own discharge instructions, which provide in relevant part as follows: "You have received emergency care only and may require further medical care as directed above. If you are unable to obtain care elsewhere or if you require urgent medical attention, you should return to this Emergency Department. If you feel your condition is not improving (and especially if it is worsening), get rechecked!" We reject the plaintiff's argument because these instructions provide a suggested course of conduct for discharged *patients*, but do not specify any particular actions to be taken by the defendant *hospital*. Specifically, they do not inform the issue of whether the decedent required urgent medical attention or whether readmission to the hospital was required. Accordingly, these instructions do not establish the appropriate standard of care in the present matter.

*Purzycki* v. *Fairfield*, 244 Conn. 101, 113, 708 A.2d 937 (1998).

We conclude that, unlike in *Bourquin* and *Shegog*, the evidence presented by the plaintiff in this case was insufficient to support an inference of proximate causation. See *Bourquin* v. *B. Braun Melsungen*, supra, 40 Conn. App. 317 (requisite causal relationship was "capable of resolution without any expert testimony other than that of expert whose opinion on the cause of death ha[d] been properly disclosed" and who indicated that decedent died of condition contracted from human tissue graft operation); *Shegog* v. *Zabrecky*, supra, 36 Conn. App. 748–50 (reports by decedent's treating physicians that he died of liver failure, not cancer, combined with report that no cancer was found in decedent's liver and testimony of defendant's expert that injection of foreign substances can cause necrosis of liver was sufficient evidence to show proximate causation).

First, with respect to the defendant's administration of Rocephin to the decedent, expert testimony was necessary to establish that the decedent died from an adverse reaction to the drug. The autopsy report[11] indicates that the decedent died of "hemolysis due to [an] idiosyncratic reaction to Ceftriaxone." The plaintiff's Internet materials do indicate that Rocephin is a form of Ceftriaxone and that "pseudomembranous colitis" is a possibly life threatening adverse reaction to the drug. They do not indicate, however, what "hemolysis" is and whether it is equivalent to "pseudomembranous colitis." See footnote 10 of this opinion. Thus, without

---

[11] Like the trial court, we assume for the sake of discussion only, that the uncertified autopsy report was properly before the court in ruling on the defendant's motion for summary judgment. See *Great Country Bank* v. *Pastore*, 241 Conn. 423, 436, 696 A.2d 1254 (1997) ("[o]nly evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment" [internal quotation marks omitted]).

the aid of expert testimony, the relationship between the defendant's administration of Rocephin to the decedent and the cause of his death could not be determined by an average layperson. Accordingly, expert testimony was necessary in order to establish that the defendant's administration of Rocephin to the decedent proximately caused his injuries and death.

Second, with respect to the defendant's alleged failure to treat or to readmit the decedent, expert testimony was necessary to establish that it was more likely than not that the injuries and death of the decedent could have been avoided had he been treated or readmitted to the emergency room in a more timely manner. The plaintiff's complaint essentially alleges that the defendant's failure to treat or readmit the decedent in a timely manner reduced the likelihood of his chance of survival or successful treatment. Thus, the plaintiff's medical malpractice claim relies, in part, upon a theory of "lost chance" or "lost opportunity."[12] See *Drew* v. *William W. Backus Hospital*, 77 Conn. App. 645, 652–53, 825 A.2d 810, cert. granted on other grounds, 265 Conn. 909, 831 A.2d 249 (2003) (appeal withdrawn December 22, 2003). "[The plaintiffs] in such cases are faced with the difficulty of obtaining and presenting expert testimony that if proper treatment had been given, better results would have followed." (Internal quotation marks omitted.) Id., 652, quoting annot., 54 A.L.R.4th 17, § 2 [a] (1987); see also *Green* v. *Stone*, 119 Conn. 300, 305–306, 176 A. 123 (1934).

In order for the plaintiff "to prevail on [his] claim that the defendant's negligent acts decreased the decedent's

[12] We reiterate that "[t]he interpretation of pleadings is always a question of law for the court" and that our "interpretation of the pleadings therefore is plenary." (Internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 265 Conn. 104; see also discussion in part I of this opinion. Although the plaintiff's complaint does not use the terms "lost chance" or "lost opportunity," we construe his complaint in this manner because it is predicated on the defendant's alleged "acts of omission rather than commission." See *Poulin* v. *Yasner*, supra, 64 Conn. App. 744 and n.17.

chance for successful treatment, [the plaintiff] must show (1) that [the decedent had] in fact been deprived of a chance for successful treatment and (2) that the decreased chance for successful treatment *more likely than not* resulted from the defendant's negligence." (Emphasis in original; internal quotation marks omitted.) *Drew* v. *William W. Backus Hospital,* supra, 77 Conn. App. 654. Thus, in order to satisfy the elements of a lost chance claim, "the plaintiff must [first] prove that *prior to* the defendant's alleged negligence, the [decedent] had a chance of survival of at least 51 percent." (Emphasis added; internal quotation marks omitted.) Id., 653; see also *Wallace* v. *St. Francis Hospital & Medical Center,* 44 Conn. App. 257, 262–64, 688 A.2d 352 (1997). Once this threshold has been met, the plaintiff must then demonstrate that the decedent had a decreased chance for successful treatment and that this decreased chance more likely than not resulted from the defendant's negligence. See *Drew* v. *William W. Backus Hospital,* supra, 655 ("a plaintiff, to prove his or her entitlement to recovery, must demonstrate lost chance in terms of probability, not possibility"). Accordingly, "it is not sufficient for a lost chance plaintiff to prove merely that a defendant's negligent conduct has deprived him or her of *some* chance; in Connecticut, such plaintiff must prove that the negligent conduct *more likely than not* affected the actual outcome." (Emphasis in original.) Id., 663; see also *Borkowski* v. *Sacheti,* 43 Conn. App. 294, 299–315, 682 A.2d 1095, cert. denied, 239 Conn. 945, 686 A.2d 120 (1996).

In the present matter, the plaintiff failed to present *any* evidence, of an expert or circumstantial nature, that (1) prior to the defendant's alleged failure to treat or to readmit the decedent he had at least a 51 percent chance of survival, (2) the decedent had a decreased chance of successful treatment, and (3) this decreased chance more likely than not resulted from the defen-

dant's negligent failure to treat or to readmit the decedent. Thus, the plaintiff put forth *no* evidence from which a lay jury could infer that the defendant's failure to treat or to readmit the decedent proximately caused his injuries and death.

We conclude that the defendant's conduct in administering Rocephin to the decedent and subsequently refusing to treat or to readmit the decedent does not meet the high threshold of egregiousness necessary to fall within the gross negligence exception to the requirement of expert testimony for a medical malpractice claim. Expert testimony was necessary in the present matter to establish the standard of care, that the defendant breached the standard, and that the defendant's breach proximately and in fact caused the injuries and death of the decedent. Because no such expert testimony could have been presented, we conclude that the trial court properly found that there was no genuine issue of material fact and properly rendered summary judgment in favor of the defendant.

IV

The plaintiff next argues that the trial court improperly held that the doctrine of res ipsa loquitur was inapplicable to the present matter. Specifically, the plaintiff asserts that "the immediate causal connection between the giving of medication, [the decedent's] obvious allergic reaction and the continued and uninterrupted deterioration in his condition until his death would allow the case to go to the jury on the doctrine of res ipsa loquitur . . . ." We disagree.

"The doctrine of res ipsa loquitur, literally the thing speaks for itself, permits a jury to infer negligence when no direct evidence of negligence has been introduced. . . . The doctrine of res ipsa loquitur applies only when two prerequisites are satisfied. First, the situation, condition or apparatus causing the injury must be such

that in the ordinary course of events no injury would have occurred unless someone had been negligent. Second, at the time of the injury, both inspection and operation must have been in the control of the party charged with neglect. . . . When both of these prerequisites are satisfied, a fact finder properly may conclude that it is more likely than not that the injury in question was caused by the defendant's negligence." (Citation omitted; internal quotation marks omitted.) *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 140, 757 A.2d 516 (2000).

We conclude that the first requirement for the application of the doctrine of res ipsa loquitur has not been satisfied in the present matter because a jury reasonably could conclude that the decedent's injuries and death could have occurred in the absence of negligence. "[T]he fact that an operation or treatment has resulted unfavorably does not, of itself, raise any presumption of want of proper care or skill." (Internal quotation marks omitted.) *Krause* v. *Bridgeport Hospital*, supra, 169 Conn. 8 (res ipsa loquitur inapplicable when patient's shoulder was dislocated during administration of barium enema).

As we have indicated, a patient may have an adverse reaction to prescription medication in the absence of the negligence of a physician or hospital in administering the drug. Moreover, even considering the plaintiff's Internet materials, these materials merely instruct that Rocephin should be given "cautiously" to penicillin-sensitive patients and accordingly, at best, indicate that the defendant made "a calculated risk" in its decision to administer Rocephin to the decedent in the hope that the drug's beneficial properties would outweigh any possible adverse effects. See, e.g., *McDermott* v. *St. Mary's Hospital Corp.*, 144 Conn. 417, 423–24, 133 A.2d 608 (1957) (res ipsa loquitur inapplicable when physician makes "calculated risk" in treatment of

patient). Additionally, a hospital initially may conclude, in the absence of negligence, that a patient's symptoms are consistent with an uncomfortable but normal reaction to prescription medication, even if the later decline of the patient's health and medical testing subsequently proves this conclusion to be in error. See *Krause* v. *Bridgeport Hospital*, supra, 169 Conn. 8. Because the decedent's injuries and death could have occurred in the absence of negligence, the trial court properly found that the doctrine of res ipsa loquitur was inapplicable to the present matter and properly rendered summary judgment in favor of the defendant.

The judgment is affirmed.

In this opinion the other justices concurred.