STATE OF MAINE                                    BUSINESS AND CONSUMER COURT
Cumberland, ss.                                   LOCATION:  PORTLAND
                                                  DOCKET NO.: BCD-CV-2021-00008


JENNIFER OWEN,                          )
                                        )
              Plaintiff,                )          ORDER DENYING
                                        )          DEFENDANT'S MOTION FOR
v.                                      )          SUMMARY JUDGMENT
                                        )
TOWN & COUNTRY FEDERAL                  )
CREDIT UNION,                           )
                                        )
              Defendant.                )


It is often said that timing is everything, and while the maxim may be an overstatement in the context of an employment discrimination dispute, this case demonstrates that timing can nevertheless be a very effective basis for an alleged victim of employment discrimination to overcome summary judgment.

On September 2, 2020, Plaintiff Jennifer Owen ("Owen") filed a two-count complaint against Defendant Town and Country Credit Union ("TCFCU") for employment discrimination under the Maine Human Rights Act (hereinafter abbreviated to "MHRA"). In Count I, Owen alleges that TCFCU violated the MHRA when it fired her because of her history of cancer and the perceived recurrence of cancer after learning she had a potentially cancerous skin growth. Count II alleges TCFCU retaliated against Owen by terminating her for engaging in a protected activity of requesting time off to go to a medical appointment related to her medical disability. TCFCU filed an answer with affirmative defenses on November 13, 2020.

TCFCU applied to have this action transferred to the Business and Consumer Court on December 30, 2020. The transfer was accepted on February 2, 2021 (*Duddy*, *J.*).

1

After discovery, TCFCU filed a Motion for Summary Judgment on November 7, 2022. Owen filed her Opposition on December 6, 2022. Due to a service issue, TCFCU's reply date was extended, and on March 7, 2023, TCFCU timely filed its Supplemental Reply in Support of its Motion. On April 26, 2023, the court held oral argument. After careful review of the cited record and arguments, for the reasons enumerated below the Court DENIES the Motion in full.

**Standard of Review**

Courts will grant motions for summary judgment when no genuine issue of material facts exists and either party is entitled to judgment as a matter of law. *Gagnon's Hardware & Furniture v. Michaud*, 1998 ME 265, ¶ 5, 721 A.2d 193, 194; M.R. Civ. P. 56(c). A fact is material when it may change the outcome of the case and "a genuine issue exists when sufficient evidence supports a factual contest to require a fact finder to choose between competing versions of the truth at trial." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. When determining whether to rule on motions for summary judgment, courts may only consider the portions of the record referred to, and the material facts set forth in the [statement of material facts]." *Osgood v. C.U. York Ins. Co.*, No. CV-04-568, 2006 Me. Super. LEXIS, at *6 (June 5, 2006) (citing *Corey v. Norman, Hanson & Detroy*, 1999 ME 196, ¶ 8, 742 A.2d 933, 938). Finally, the court gives the party opposing a summary judgment the benefit of any inferences that might reasonably be drawn from the facts presented. *Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18, 22. However, courts may disregard facts that do not conform with the rules of civil procedure. *See Stanley v. Hancock County Commissioners,* 2004 ME 157, ¶¶ 27-29, 864 A.2d 169; *Osgood*, 2006 Me. Super. LEXIS, at *6 (June 5, 2006) (disregarding facts that "almost completely disregarded the real issues raised by the applicable law and either squabble over unimportant or immaterial fact. These types of statements of fact will not be considered.").

**FACTS**

The court finds the following facts for the limited purpose of deciding the present motion for summary judgment.

**Background**

TCFCU is a member-owned, not-for-profit Maine financial cooperative which has operated six (6) branches in Maine from 2012 until present and has an Operations Center (the "Operations Center") in Scarborough, Maine. (Supp.'g S.M.F. ¶ 1.) Owen began working for TCFCU in 2012 and was employed at TCFCU until October 25, 2018. (Supp.'g S.M.F. ¶ 2.) Owen was employed as a Members Service Representative 2 ("MSR 2") at TCFCU's Scarborough Branch, which is separate from the Operations Center, at the time of her termination. (Supp.'g S.M.F. ¶ 2.) Betsy St. Pierre ("St. Pierre") is presently TCFCU's Human Resources Manager and has held this position since April 2017. (Supp.'g S.M.F. ¶ 3.) Heather Savage, now known as Heather Therrein but hereinafter referred to as Savage for clarity, was a Consumer Loan Manager at TCFCU in 2018. (Supp.'g S.M.F. ¶ 4.) In the fall of 2018, both St. Pierre and Savage worked at the Operations Center. (Supp.'g S.M.F. ¶¶ 3-4.) Karina Rosewell ("Rosewell") was the TCFCU branch manager at the Scarborough Branch and worked directly with Owen in October 2018. (Supp.'g S.M.F. ¶ 5.) St. Pierre kept in touch with managers, including Rosewell, on employee issues. (Opp. S.M.F. ¶ 23.)

**Owen's History of Cancer**

In July 2013, Owen was diagnosed with breast cancer (invasive ductal carcinoma). (Supp.'g S.M.F. ¶ 6; Opp. S.M.F. ¶ 6.) Between August and December 2013, Plaintiff received treatment for her cancer, which included a sequence of chemotherapy, surgery, and then, as a precaution, radiation. (Supp.'g S.M.F. ¶ 8; Opp. S.M.F. ¶ 8.) Following her surgery in

November 2013 and completing radiation, Owen entered remission and has not had any cancer recurrences. (Supp.'g S.M.F. ¶ 9 Opp. S.M.F. ¶ 9.) However, while in remission, Owen continued to receive hormone therapy, and attends yearly checkups where she has mammograms. (Opp. S.M.F. ¶ 9.)

Prior to becoming Owen's manager, Rosewell had participated in the "Tri for a Cure" on Owen's behalf. (Supp.'g S.M.F. ¶ 18.)

**Owen's Employment History with TCFCU**

Owen was hired by TCFCU in April 2012 as a teller. (Opp. S.M.F. ¶ 4.) She was promoted to "Teller 2" within a year and was later promoted to Assistant Branch Manager in 2015. (Opp. S.M.F. ¶¶ 5, 10, 11.) In 2016, while serving as an Assistant Branch Manager, Owen received an overall rating of 3.31 out of 5 and "competent" in the area of member focus on an evaluation. (Opp. S.M.F. ¶ 11). The ranking of "competent" in member focus on the evaluation is rating 3 of 5 and defined as "[f]ollows through in meeting member needs. Demonstrates positive professional behavior in interactions with members and internal customer." (Opp. S.M.F. ¶ 12.)

In May of 2017, Owen transferred to the South Portland Branch as an Assistant Branch Manager and worked under Sara Thiele, who was her direct supervisor at the time. (Opp. S.M.F. ¶ 13; Supp.'g S.M.F. ¶ 11. ) In Owen's 2017 evaluation, St. Pierre rated Owen at 3.17 and "competent". (Opp. S.M.F. ¶ 14.) Towards the end of 2017, Owen talked to St. Pierre and asked to step down from the Assistant Branch Manager position to a Teller role due to stress. (Opp. S.M.F. ¶¶ 15-16, 17.) Owen was moved into the MSR 2 position in early 2018. Opp. S.M.F. ¶ 19.)As a MSR 2, Owen's job duties included: explaining services to TCFCU members and potential members, managing and completing members' loan applications, and directing members

4

to other staff specialists as needed. (Supp.'g S.M.F. ¶ 12; Opp. S.M.F. ¶ 27.)

On February 21, 2018, while employed as a MSR 2 at the South Portland Branch, Owen was issued a written Employee Warning Notice (the "February 2018 Warning") that stated that she had unsatisfactory work quality and had engaged in carelessness. (Supp.'g S.M.F. ¶¶ 11,13.) Further, the February 2018 Warning said that that if these types of incidents should occur again, it could result in termination. (Supp.'g S.M.F. ¶ 13.) Savage was the drafter of the February 2018 Warning. (Supp.'g S.M.F. ¶ 13.) After being delivered the February 2018 Warning, Owen checked the box "I Agree with Employer's Statement" and signed the warning notice without contesting, challenging or disputing any aspect of the warning notice. (Supp.'g S.M.F. ¶ 14.)

On February 28, 2018, after Owen was issued the warning, St. Pierre and Savage drafted a Performance Coaching Worksheet for Owen to review with her when they met with her to discuss her work performance and additional subsequent issues. (Supp.'g S.M.F. ¶ 15.) The Performance Coaching Worksheet noted the issues cited in the February 2018 Warning, as well as Plaintiff's subsequent poor judgment in telling coworkers and a TCFCU member that she thought she was going to be fired in a week related to her poor performance, which both St. Pierre and Savage found unprofessional and inappropriate. (Supp.'g S.M.F. ¶ 16.)

In August 2018, Owen laterally transferred to the Scarborough Branch where she continued to be employed as a MSR 2. (Supp.'g S.M.F. ¶ 17; Opp. S.M.F. ¶ 24.) As a result of Owen's transfer to the Scarborough Branch, Rosewell became her manager. (Supp.'g S.M.F. ¶ 17.) Rosewell and Owen got along very well. (Supp.'g S.M.F. ¶ 18.)

The Scarborough Branch did not have an assistant branch manager at the time of Owen's transfer, but Rosewell planned to continue without an assistant branch manager and Owen was not transferred to fill the managerial position. (Opp. S.M.F. ¶¶ 25-26.) Despite not having an assistant

branch manager, Rosewell left the office on multiple occasions while Owen was on shift. (Opp. S.M.F. ¶ 28.)

After transferring to the Scarborough Branch, Owen met a couple times with Rosewell to discuss expectations and Owen frequently initiated meetings with Rosewell to discuss her ongoing work. (Opp. S.M.F. ¶¶ 38-29.) Rosewell frequently told Owen that she was making satisfactory progress (Opp. S.M.F. ¶ 41.) While working at the Scarborough Branch, some of the loans Owen worked on were complex and she had little training on such loans. (Opp. S.M.F. ¶¶ 29, 31.) Owen spoke to Rosewell about the need for additional training for complex loans. (Opp. S.M.F. ¶ 30.)

Owen was never issued any written disciplinary notices while working at the Scarborough Branch. (Opp. S.M.F. ¶ 42.)

**The First Skin Growth**

In late August 2018, shortly after her transfer, Owen noticed a skin growth, which her doctor froze and removed at her annual doctor's appointment that same month. (Supp.'g S.M.F. ¶ 19; Opp. S.M.F. ¶¶ 32, 35.) Owen feared the growth signaled the return of her cancer. (Opp. S.M.F. ¶ 33.) Owen told Rosewell and other coworkers at the Scarborough Branch about the skin growth and her fear that it might be cancer. (Supp.'g S.M.F. ¶ 20.)

**October 2018 Performance Problems**

In or around October 2018, Owen mistakenly sent one TCFCU's member credit score and confidential information to another TCFCU member. (Supp.'g S.M.F. ¶ 22.) Savage became aware of the mistake through Crystal Cormier, a TCFCU loan officer. (Supp.'g S.M.F. ¶ 22.) There may have also been an issue with Owen's processing of a customer's home equity loan and inputting the correct escrow accounts around that time. (Supp.'g S.M.F. ¶ 23.)

Through her role in supervising TCFCU's loan processing at different branches, Savage became aware that Owen may have been having performance problems, so a week or two prior to Owen's termination, Savage met with St. Pierre to discuss Owen's recent work performance. (Supp.'g S.M.F. ¶ 24.)

**The Second Skin Growth and Owen's Doctor Appointment**

On October 24, 2018, Owen noticed the skin growth had returned and called her doctor. (Supp.'g S.M.F. ¶ 25; (Opp. S.M.F. ¶ 36.) Owen's doctor told her to come in the next day so she made an appointment for the morning of October 25, 2018. (Supp.'g S.M.F. ¶ 25; (Opp. S.M.F. ¶ 37.) After making the appointment, Owen told Rosewell the growth had returned and about the scheduled appointment. (Supp.'g S.M.F. ¶ 26; Opp. S.M.F. ¶ 46.) Rosewell told Owen that the growth was not a big deal and did not need to be looked at. (Opp. S.M.F. ¶¶ 48-49.) Owen understood Rosewell's dismissiveness as Rosewell not wanting Owen to take work off to go to the doctor's appointment. (Opp. S.M.F. ¶ 50.)[1]

On the morning of October 25, 2018, despite Rosewell's comments, Owen attended her medical appointment and then reported to work, where she felt tension from Rosewell. (Opp. S.M.F. ¶¶ 51-53.)

**October 25, 2018 and Owen's Termination**

The same morning Owen attended a medical appointment for the potentially cancerous skin growth, Rosewell called Savage to discuss Owen. (Supp.'g S.M.F. ¶ 28; Opp. S.M.F. ¶ 57.) Rosewell says she called Savage because Owen was voicing her concerns that she was going to be fired due to the number of service requests she had to

---

[1] It is unclear from the record if Owen was granted time off to go to the appointment or if her request was denied.

other employees. (Supp.'g S.M.F. ¶ 28.) After Rosewell called Savage, Savage called St. Pierre and the two met again to discuss Owen. (Supp.'g S.M.F. ¶ 29; Opp. S.MF. ¶¶ 59,63.) St. Pierre and Savage maintain that they only discussed Owen's performance issues; specifically, Owen sending one TCFCU's member credit score information to another TCFCU member and her comments that she thought she was going to be terminated because of her number of service requests. (Supp.'g S.M.F. ¶ 29.) Rosewell was not part of this conversation. (Supp.'g S.M.F. ¶ 29.) Savage and St. Pierre say they considered the error regarding the credit scores and member information substantial and Owen's conduct egregious, particularly in light of Owen's February 2018 Warning and Performance Coaching Worksheet earlier that year; and accordingly, determined that Plaintiff's employment should be terminated. (Supp.'g S.M.F. ¶ 30.) Rosewell did not play any role in St. Pierre and Savage's decision to terminate Owen's employment. (Supp.'g S.M.F. ¶ 31.)

At some point after their meeting and Owen's return to work, St. Pierre and Savage traveled from the Operations Center to the Scarborough Branch and met with Owen for the purpose of terminating her employment. (Supp.'g S.M.F. ¶ 33.) Rosewell was informed that St. Pierre and Savage had made the decision to terminate Owen's employment and were coming to the Scarborough Branch to meet with Owen to terminate her employment. (Supp.'g S.M.F. ¶ 34.) The termination notice prepared by St. Pierre and given to Owen said in part that she was being terminated because her performance had not improved since the issuance of the February 2018 Warning. (Opp. S.M.F. ¶ 66.) This communication was the first time Rosewell became aware that Savage and St. Pierre had decided to terminate Owen's employment. (Supp.'g S.M.F. ¶ 35.)

8

St. Pierre and Heather Savage then met with Owen at the Scarborough Branch, without Rosewell, and informed Owen that her employment was being terminated on the grounds of poor work performance, repetitive errors, and poor judgment. (Supp.'g S.M.F. ¶ 36.)

St. Pierre and Savage were the only decision-makers involved with Owen's employment termination. (Supp.'g S.M.F. ¶ 37). Rosewell, Savage, and St. Pierre all maintain that Rosewell did not tell Savage or St. Pierre of Owen's cancer concerns or doctor appointment despite the call occurring the same day Rosewell called Savage. (Supp.'g S.M.F. ¶¶ 21, 27, 38-39.) Accordingly, St. Pierre and Savage maintain that they were not aware of Owen's skin growth, concerns that her cancer had returned, or medical appointments at the time they made the decision to terminate her employment. (Supp.'g S.M.F. ¶¶ 38-39.) St. Pierre and Savage say they did not discover this information until Owen filed a Complaint of Discrimination with the Maine Human Rights Commission ("MHRC"). (Supp.'g S.M.F. ¶¶ 38-39.)

**TCFCU's Progressive Discipline Policy**

Defendant maintains a written Progressive Discipline Policy which is documented in its Employee Handbook. (Opp. S.M.F. ¶ 1.) The policy in part reads:

> The purpose of this policy is to state Town & Country's position in administering equitable and consistent discipline for unsatisfactory conduct in the workplace. The best disciplinary measure is the one that does not have to be enforced and comes from good leadership and fair supervision at all employment levels.
> …
> Although employment with Town & Country is based on mutual consent and both the employee and Town & Country have the right to terminate employment at will, with or without cause or advance notice, Town & Country may use progressive discipline at its discretion.
> …
> Progressive discipline means that, with respect to most disciplinary problems, these

steps will normally be followed: a first offense may call for a written warning, another offense *may* call lead to a suspension, and still another offense may lead to termination of employment. Town and Country recognizes that there are certain types of employee problems that are serious enough to justify either a suspension or in extreme situations termination of employment without going through the usual progressive steps.

(Opp. S.M.F. ¶¶ 2-3; Owen Dep. Ex. 11 at T&CFCU-316 – 317.) TCFCU did not utilize all the progressive discipline policy's steps when handling Owen's performance problems.

## DISCUSSION

Owen's claims arise under the Maine Human Rights Act ("the MHRA"), 5 M.R.S. § 4551 *et seq*. Disability discrimination and retaliation are two separate claims that require separate analysis because "[i]n the discrimination context, causation links disability status to discharge, whereas in the retaliation context, causation links protected activity to discharge. Therefore, the [court's] analysis as to causation in the discrimination context [will] not [be] applicable to [Owen]'s retaliation claim." *See Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 21, 45 A.3d 722. Therefore, the court turns to each count in turn.

"[W]hen judges evaluate a summary judgment record, they should be mindful that what might initially appear to be a weak case of pretext is not the same as no case," *Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 20, 66 A.3d 7, and "exercise caution in resolving issues of pretext on summary judgment in employment discrimination cases." *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 17, 974 A.2d 276. While the rules governing summary judgment permit parties to rely on the affidavits of interested or self-serving witnesses to establish a dispute of material facts, plaintiffs in employment discrimination cases may create a jury question and survive summary judgment by presenting and properly supporting circumstantial evidence that "defendant's explanation for an employment practice is 'unworthy of credence.'" *See Stanley,* 2004 ME 157, ¶¶ 18-23, 864 A.2d

169 (discussing and applying guidance given by the Supreme Court of the United States in *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) and *Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003) on the creation of jury questions in discrimination cases). A plaintiff may generate a jury question "by simply denying the [defendant's] assertions and [] supporting his denials with record citations to circumstantial evidence" that draws defendant's explanation into question. *See Stanley*, 2004 ME 157, ¶ 21, 864 A.2d 169. Plaintiffs in these types of cases may also use supported circumstantial evidence to create jury questions when there are factual disputes concerning the timing over the decision to take adverse action in relation to when the defendant's decision maker knew of the protected status or activity. *See Cookson*, 2009 ME 57, ¶ 25, 974 A.2d 276.

The court emphasizes that the mere presence of issue regarding knowledge, motivation, or intent does not relieve plaintiffs of their burden to produce evidence sufficient to create a question of fact on knowledge, motivation or intent. *See Stanley, 2004 ME 157, ¶ 25, 864 A.2d 169.* The ultimate question for the Court on summary judgment is not the relative credibility or sufficiency of the evidence but rather, whether Owen asserted sufficient facts, supported in the summary judgment record, from which a reasonable fact-finder could *disbelieve* the TCFCU's proffered rationale and conclude that illegal discrimination or retaliation was the true motivating factor for terminating Owen's employment. *See Cookson*, 2009 ME 57, ¶ 23, 974 A.2d 276.

**Count I: Disability Discrimination**

In employment discrimination cases at the summary judgment phase, a three-step, burden shifting analysis is utilized. *Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 16, 168 A.3d 768; *Daniels*, 2012 ME 80, ¶ 14, 45 A.3d 722; *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 14, 974 A.2d 276; s*ee also Doyle v. Dep't of Hum. Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48 (citing to the

seminal burden-shifting case - *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Pursuant

to that analysis:

> [A]n employee must first establish a *prima facie* case that (1) she has a disability;
> (2) she is otherwise qualified, with or without reasonable accommodations, to
> perform the essential functions of her job; and (3) her employer adversely treated
> her based in whole or in part on her disability. If the employee produces *prima facie*
> evidence of each element, the burden shifts to the employer to establish that it had
> a legitimate, nondiscriminatory basis for its actions; if the employer does so, "the
> burden shifts back to the employee to produce evidence that the employer's
> proffered reason is a pretext to conceal an unlawful reason for the adverse
> employment action.

*Carnicella,* 2017 ME 161, ¶ 16, 168 A.3d 768 (citing to *Daniels* and *Trott v. H.D. Goodall Hosp.*,

2013 ME 33, ¶ 13 66 A.3d 7).

***Owen's Prima Facie Case***

I.      <u>Owen is disabled under the MHRA</u>

A plain reading of the statute indicates that cancer, having a history of cancer, or being

regarded as having or likely to develop cancer are all grounds for finding disability under the

MHRA as defined under 5 M.R.S. § 4553-A(1)(B-D).[2] "The Maine Legislature clearly sought to

protect persons with these conditions even though the conditions may be characterized by long

---

[2] The full definition of physical or mental disability under the MHRA, 5 M.R.S. § 4553-A(1) reads:
1. **Physical or mental disability, defined**. "Physical or mental disability" means:
    A. A physical or mental impairment that:
        (1) Substantially limits one or more of a person's major life activities;
        (2) Significantly impairs physical or mental health; or
        (3) Requires special education, vocational rehabilitation or related services;
    B. Without regard to severity unless otherwise indicated: absent, artificial or replacement limbs, hands, feet or vital organs; alcoholism; amyotrophic lateral sclerosis; bipolar disorder; blindness or abnormal vision loss; cancer; cerebral palsy; chronic obstructive pulmonary disease; Crohn's disease; cystic fibrosis; deafness or abnormal hearing loss; diabetes; substantial disfigurement; epilepsy; heart disease; HIV or AIDS; kidney or renal diseases; lupus; major depressive disorder; mastectomy; intellectual disability; multiple sclerosis; muscular dystrophy; paralysis; Parkinson's disease; pervasive developmental disorders; rheumatoid arthritis; schizophrenia; and acquired brain injury;
    C. With respect to an individual, having a record of any of the conditions in paragraph A or B; or
    D. With respect to an individual, being regarded as having or likely to develop any of the conditions in paragraph A or B.

periods without an episode and/or periods when the conditions are in remission." *Pappas v. Leask*, No. BCD-CV-15-07, 2016 Me. Bus. & Consumer LEXIS 37, *18-19 (April 16, 2016). (finding that a seizure disorder which was asymptomatic, had not manifested itself for many years and could be controlled by taking certain measures nonetheless constituted a disability.)

It is undisputed that Owen has a history of cancer.[3] Further, she was vocal at work about her concerns that the skin growth, which grew back within months of being removed, was a reoccurrence of cancer. Even though the skin growth ultimately turned out to be benign, Rosewell had months to mention the first appearance of the skin growth to Savage or St. Pierre and called Savage the morning of Owen's medical appointment to have the skin growth examined again. The issue of when Savage and St. Pierre learned of Owen's skin growth is a materially disputed fact supported by circumstantial evidence that would be inappropriate to resolve on summary judgment. *See Cookson,* 2009 ME 57, ¶ 25, 974 A.2d 276 ("Thus, the timing of [the decision maker's] ultimate decision, relative to when he knew of [the plaintiff's] [protected status], is, on the record before us, a material disputed fact inappropriate for resolution at the summary judgment stage.") Timing may not be everything, but here it is enough to generate a dispute over whether Owen's supervisors regarded her as having cancer.

Therefore, when viewing the summary judgment record and resolving ambiguities in favor of Owen as the non-moving party, Owen has satisfied her *prima facie* burden to show she was a protected person due to disability under the MHRA at the time of her termination.

II.    *Owen was qualified to perform the role with or without reasonable accommodations*

---

[3] Defendant's narrow focus in its briefs and at oral argument on the "regarded as" prong of the disability definition misses the fact that Owen has a record of having cancer, even though the cancer went into remission five years previously. Owen still takes cancer-related medications and gets annual screenings.

Owen worked for TCFCU for nearly six years before being issued a written warning in February 2018. Prior to that, Owen had moved up the managerial ladder to become an Assistant Branch Manager and asked to step down—she was not removed. After receiving the February 2018 Warning, Owen received no other written warnings and it is undisputed that Rosewell told her she was making satisfactory progress. Therefore, although Owen made some mistakes, a jury could reasonably find that Owen was qualified for the position she was in with or without reasonable accommodations.

### III.    *Owen's cancer risk may have influenced the decision to terminate her*

While there is conflicting evidence of animus and knowledge, due to the timing and circumstances surrounding Owen's termination, it is for the fact finder to decide what St. Pierre and Savage knew, and how that knowledge influenced their decision. *See Daniels,* 2012 ME 80, ¶ 17, 45 A.3d 722. Again, timing is a powerful piece of circumstantial evidence. A reasonable jury could find that TCFCU terminated Owen based on or in part on her disability, and that is sufficient for the third element. *Id.*

### IV.    *Owen has made a prima facie case.*

For the reasons above, the Court finds Owen has made a *prima facie* showing. The burden now shifts to TCFCU to establish that it had a legitimate, nondiscriminatory basis for terminating Owen.

### TCFCU's Non-discriminatory basis for terminating Owen

TCFCU cites two issues in October 2018 that lead to Owen's termination. First, she accidentally sent credit score and confidential information to the wrong member. Secondly, she persisted in telling her co-workers that she thought she was going to get fired, which she had been

14

warned not to do in February 2018. TCFCU has established that it had a legitimate, nondiscriminatory basis for its actions.

*Pretext*

Inconsistencies and deviations from standard operating procedures may be indicative that the employer's legitimate reason for the adverse action is a pretext. *See Boyajian v. Starbucks Corp.* D. Me. 2008, 587 F. Supp. 2d 295 (D. Me 2008); *Velez v. Thermo King de P.R., Inc.* 585 F.3d 441 (1st Cir. 2009). Here, Owen challenges the severity of the credit score issue and denies telling her coworkers that she felt she would be terminated. Owen was not immediately terminated or issued written warnings in response to the credit score issue and the cited record does not clearly establish what Owen was saying or to whom. The record is also unclear as to the timing of Owen's return to the office, when Rosewell learned of Owen's comments about thinking she would be fired, and when Rosewell called Savage. The cited portions of the depositions do not correlate with either parties' arguments as well as they might hope. Moreover, by being ambiguous, the record calls into question why TCFCU elected not to utilize all the steps described in the progressive disciplinary policy set out in its handbook. While the handbook does make allowances for deviation, a reasonable jury could find that based on the circumstances that Owen's disability may have been a factor in TCFCU's decision to skip the progressive disciplinary steps and move to immediately terminate Owen's employment. Therefore, it will be the job of the jury to decide the legitimacy of TCFCU's basis for terminating Owen and whether it was a mere pretext.

*Count I Conclusion*

For the reasons above, the TCFCU's Motion for Summary Judgment in regard to Count I is DENIED.

## Count II: Retaliation

To establish a *prima facie* claim of retaliation, Owen must establish: (1) that she engaged in statutorily protected activity; (2) her employer made an employment decision that adversely affected her; and (3) that "there was a causal link between the protected activity and the adverse employment action." *Daniels*, 2012 ME 80, ¶ 21, 45 A.3d 722. "Temporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie case." *Id*; *see also Watt v. UniFirst Corp.*, 2009 ME 47, P 33, 969 A.2d 897; *Doyle,* 2003 ME 61, P 20, 824 A.2d 48.

A request to go to the doctor's concerning an issue related to known disability can be statutorily protected activity if the employee makes the request as an accommodation request. *See Taghavidinani v. Riverview Psychiatric Ctr.*, No. 1:16-cv-00208-JDL, 2018 U.S. Dist. LEXIS 35403, at \*20 (D. Me. Mar. 5, 2018) (finding a doctor's note containing information about a disability and suggesting a transfer for the employee constituted an accommodation request); *Doyle.*, 2003 ME 61, ¶ 21, 824 A.2d 48 (finding that an employee discussing with the human resources office and requesting the ability to get up and move around was protected activity when the request was made as a reasonable accommodation). While claims under the American with Disabilities Act ("ADA") may limit employers need to accommodate parties "regarded as" disabled, the MHRA is intended to be interpreted broadly to provide greater coverage than the ADA and may not be as restrictive. *Kendrick v. Me. Med. Ctr.*, 547 F. Supp. 3d 87, 104 n.17 (D. Me. 2021)(deciding not to apply the ADA's restrictions on the applicability of the "regard as" theory to the MHRA due to the intention that the MHRA provide greater protections.)

There is a triable question of fact whether Owen's request to go to the medical appointment for the skin growths was a statutorily protected activity. It is undisputed that (1) Owen called her

16

doctor on October 24, 2018 because the skin growth had come back and made an appointment for the very next morning, (2) Owen informed Rosewell on October 24, 2018 that she had made a doctor's appointment for the following morning because of the skin growth's return, (3) Rosewell was aware that Owen was concerned the skin growth was cancerous and downplayed Owen's concerns, (4) Owen took the morning of October 25, 2018 off to attend the appointment,[4] (4) Owen returned to work after the appointment, and (5) Owen's employment was terminated sometime after she returned to work after the doctors appointment.

The record however is ambiguous in regard to (1) whether Owen requested time off as a reasonable accommodation and if so, on what grounds, (2) if Owen requested or demanded the time off, (3) if Owen communicated to Rosewell that it was Owen's doctor that told her she needed to come in the next day or if Rosewell did not realize the urgency behind the last minute request, (4) if Rosewell gave Owen time off to attend the appointment and Owen took her comments as an attempt to try to dissuade her from going, (5) if Rosewell did deny Owen the time off, on what grounds Rosewell denied the request, and (6) if a request for time off is something that would be communicated to Savage or St. Pierre. These are all facts that are in dispute and go toward whether Owen's conversation with Rosewell included the protected activity of making a request to attend a medical appointment related to her disability, and if so, was the request a reasonable request.[5]

However, because it is known that Owen is disabled and the time off needed was to attend a doctor's appointment directly related to that disability, for the purpose of summary judgment, the court finds Owen's request for time off to go to the doctor's was a protected activity. Further,

---

[4] It is unclear from the record if Owen actually requested time off to attend the doctor's appointment or if she informed Rosewell that she would be attending the doctor's appointment.
[5] The Court notes that neither party delves into the reasonableness of the short notice request.

Owen's termination, which was an adverse employment action, came on the heels of Owen requesting time off for the doctor's appointment.

Therefore, Owen has made a *prima facie* case for retaliation and TCFCU's Motion for Summary Judgment on Count II: Retaliation is DENIED.

**CONCLUSION**

For the reasons detailed above, TCFCU's Motion for Summary Judgment is DENIED. So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

Date: **04/27/2023**

_____
Michael Duddy
Judge, Business and Consumer Court

Entered on the docket: 04/27/2023